IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19 CR 00035 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DEMETRIUS N. PITTS, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman,

United States Attorney for the Northern District of Ohio, and Michelle M. Baeppler, Assistant

United States Attorney, and hereby submits this sentencing memorandum.  For the reasons

described below, the government recommends that the Court sentence the Defendant, Demetrius

Pitts, to 168 months of imprisonment and a lifetime period of supervised release.  This

sentencing recommendation is consistent with the agreement of the parties.

## I.      PROCEDURAL BACKGROUND AND FACTS

Defendant Demetrius Pitts was convicted after entering guilty pleas to counts 1, 2, and 3 of a

Superseding Indictment charging him with Attempting to Provide Material Support to a Foreign

Terrorist Organization, Making Threats against the President of the United States, and Making

Threats against Family Members of the President of the United States.  Pitts entered a plea

pursuant to a binding plea agreement, wherein the parties agreed to recommend to the Court a

sentence of imprisonment of 168 months, or 14 years, and a period of lifetime supervised release.

The evidence showed that from in or around February 13, 2018, to July 1, 2018, Pitts attempted

to provide material support and resources to al Qaeda, a foreign terrorist organization.

Pitts was active and vocal online in voicing his support for al Qaeda and other terrorist organizations.  Eventually, in early to mid-2018, Pitts met up with an undercover employee (UCE) of the federal government and shared his intentions and desires to commit acts of terrorism here in the United States.  During his interactions with the UCE, Pitts expressed hatred for the United States, in particular its military, military policy and involvement in the Middle East.  This hatred of the U.S. Military appears to be the genesis of Pitts' terroristic desires and intentions.

Pitts terroristic desires were years in the making.  On December 31, 2015, a Facebook profile  for Abdur Raheem Rafeeq (which was ultimately determined to be PITTS) came to the FBI's attention after RAFEEQ sent a private Facebook message to "The Craig Sewing Show," a California-based political commentary program, stating: "Fuck America and there arm[sic] forces. The USA will be destroy. Allahu Akbar."

On January 25, 2017, Pitts used his Facebook account Abdur Raheem Rafeeq to comment on pictures believed to be from a jihad training camp.  Pitts posted, "We as Muslim need to start. Training like this everyday. We need to known how to shoot guns. Throw hand grenades hand to hand combat. How survey out in the woods. Look at the bed blue eyed devils. They teach their little dogs on how to shoot and Hunt. If you fear death. Then don't say you love Islam. The Rasool saw said. We should always be prepared to fight in the name of Allah Akbar. All cowards stay home. Walsalaam. Abdur Raheem sahl Rafeeq. Allahu Akbar Allahu Akbar Allahu Akbar."

In July 2017, on a social media platform, Pitts expressed a desire to recruit people to kill Americans that were against Muslims and also stated he would have no remorse if he killed in the name of religion.

2

From September 2017 through April 2018, FBI Cincinnati's[1] investigation revealed that Pitts was willing to conduct a U.S. based attack and was willing to join a FTO.  Investigation revealed that in February 2018, Pitts expressed interest in joining al Qaeda, and training overseas and returning to the U.S. to conduct an attack.

In April 2018, Pitts stated a desire to target members of the U.S. military that had killed Muslims overseas.

With time, Pitts' appetite and desire to carry out a terrorist attack grew.  The evidence proved that Pitts was not merely an unsophisticated, online al Qaeda supporter who never attempted to put his beliefs into action.  Instead, Pitts engaged in conduct in an effort to put his plan for a terrorist attack into action.

On June 15, 2018, PITTS met with a UCE in Willoughby, Ohio, and had a conversation with him/her wherein Pitts again talked about killing.[2]  The following is an excerpted portion of conversation that occurred during the recorded meeting:

DP:　I told you my favorite thing is head, hand, hand. You take the head…

UCE:　The three H's right.

DP:　Yeah, one two three. You take the head and the three hands and that's how you make your statement. You send it straight to 'em.  The person's head and his and his two hands. And they know right off the bat, boy these people ain't playing.

UCE:　Can you imagine the fear that that would strike in the hearts. I mean that would spread through the millions.

DP:　Oh yeah. And I'm not-I'm not scared to do it. That's how I would send Donald Trump back. Head, hand, hand that and I be like. I wouldn't leave no type of message or nothing. It would be self-explanatory. It'd be a message. It'd be like whoever we messing with…

---

[1] The investigation of Pitts' activities began in Cincinnati when Pitts was residing in that area.

[2] The UCE was introduced to Pitts because Pitts had expressed a desire to meet with an al Qaeda "brother."

UCE:   Right, right.

DP:    is not playing with us. Yeah and then you send them another one every week.

UCE:   Right.

DP:    One of they one of they, um public there come another one they like wait a minute, whoever this is, he after us.

Later in the meeting, Pitts and the UCE began to discuss more specific targets to attack.

DP:    Like you gotta wanna blow up marathons and stuff. No, no, no you dumb nuts.

UCE:   Yeah.

DP:    Leave them sports places alone. Allah said don't-he said kill those you in the war with.

UCE:   Right.

DP:    These people ain't got nothing to do with it.

UCE:   Right. Plus you look at the Boston Marathon, they only killed three people. Come on.

DP:    And nobody who was of the government.

UCE:   Right, right, right. So that's the-that's the trick right? So you're right because if we're gonna go after our real enemies you know, the officials like you're saying, like you know the government officials, um the trick is, is when they're inside their building they got their big fortresses of government buildings.

DP:    Right.

UCE:   You know. Where they got their own metal detectors and all that. It's not just the White House that-that have all those…

DP:    It's all of 'em.

UCE:   Security guards.

DP:    You wanna hit places, hit some of these army bases.

UCE:   Yeah.

4

DP:     Okay I ain't-I ain't mad at you when you hit them.

UCE:    Yeah, yeah.

DP:     Hit them, kill them.

UCE:    Yeah, yeah.

DP:     Okay now that's-now that's a point for us.

UCE:    So.

DP:     But when y'all go blow up stupid shit…

UCE:    Right.

DP:     Then y'all just took the points all the way down.

Later in the conversation, Pitts expressed his desire to kill a member of the United States military:

DP:     The ones I would kill off and stuff like that would be the Marines. 'Cause that's all they-they already know what they gonna do.  The Marines.

On June 22, 2018, Pitts met with the UCE in Walton Hills, Ohio.  Pitts suggested launching an attack in Cleveland for al Qaeda during the July 4 holiday.  The following is an excerpt of the conversation between Pitts and the UCE:

DP:     I'm trying to figure this out. I'm trying to figure out something that would shake them up on the 4th of July.

UCE:    Alright.

DP:     See I-I that's why I like chess.

UCE:    Ahhh.

DP:     That's why I like chess. Um but I…

UCE:    4th of July.

DP:     Got a good one for 'em.

UCE:   You know that's when uh they have like the 4th of July, the parades.

DP:   The firecrackers.

UCE:   The firecrackers.

DP:   Oh yeahhh.

UCE:   Firecrackers.

DP:   Let's see, let now, hold up listen.

UCE:   Alright.

DP:   You gotta pay attention.

UCE:   Alright, alright.

DP:   Let's see. Alright.

UCE:   4th of July.

DP:   What would what would hit them in the core? Blow up in the, have a bomb to blow up at the 4th of July parade.

UCE:   Okay.

DP:   You taking out, taking out all sides. You gotta sit up from, from the uh, you gotta wait 'til the parade start where, where it gets into motion.

UCE:   Okay.

DP:   And then once it get to the heart of the city.

UCE:   Yeah.

DP:   You blow it up from there and you have blow it up in three sections.

UCE:   Alright.

DP:   Only thing about it. They got cameras in places you got, oh man that's thing about all these damn cameras. They got cameras everywhere.

UCE:   Yeah.

Later in the conversation Pitts suggested detonating the bomb on July 4th, once night fell:

DP:    What time is they fireworks?

UCE:  It's at night. I think they start um, 'cause it doesn't get dark, the sun goes down like mugrib (Islamic sunset prayer) is still at about nine so it's like the fireworks usually start about ten.

DP:    That might be a good time to hit 'em. Oh look night they can't see nobody. You ever realize that? Nobody can just see. Everybody can just mix in the crowd. Everybody. That's probably one of the best times. Cause remember the uh, them little remote cars…

UCE:  Alright so we got.

DP:    [inaudible] that sounds even better.

As the conversation progressed, Pitts and the UCE "Googled" a map of downtown Cleveland, where Pitts determined an explosive device would have the most "impact."  After learning the fireworks would be launched from or near Voinovich Parks, Pitts exclaimed, "Oh there you go. Oh yeah."  Pitts was further pleased that also located near Voinovich Park is the United States Coast Guard Station, the United States Army Corps of Engineers, and the Celebreeze Federal Building.

The June 22, 2018, meeting between Pitts and the UCE concluded with Pitts indicating to the UCE that he would travel to downtown Cleveland soon to conduct surveillance of Voinovich Park and the U.S. Coast Guard station for the purpose of taking photographs and videotape footage.  Pitts indicated that the footage would then be transferred, via an intermediary, to the al Qaeda "brothers."  Pitts also expressed a desire, while downtown Cleveland, to take a U.S. Coast Guard tour and gain as much information as he could about the layout of the facility.

On June 26, 2018, Pitts contacted the UCE via text message. In these text messages, Pitts relayed to the UCE that he had completed the reconnaissance of the designated downtown

Cleveland spots and that he desired to "destroy the government."[3]  Pitts also indicated in these text messages that he intended to travel to Philadelphia, Pennsylvania, to conduct reconnaissance, as Philadelphia is his hometown and he knows it best.  Pitts indicated that it was his "job" to "go look at the base of the ground," and that it was up to other "brothers" to complete the other parts of the job.

Later on June 26, 2018, Pitts and the UCE spoke on the telephone.  During the conversation, the UCE questioned Pitts as to whether the al Qaeda brothers should continue building the bomb for the Cleveland location and the July 4th holiday, given that Pitts intended to go to Philadelphia to conduct reconnaissance in furtherance of a terrorist attack.  Pitts responded, "keep building."

During the morning hours of June 27, 2018, a confidential human source (CHS) met with Pitts at a predetermined location in Maple Heights, Ohio.  The purpose of the meeting was for Pitts to turn over a phone containing reconnaissance photos and videos to the CHS, so the CHS could in turn provide the photos and videos to the al Qaeda brothers. Pitts gave the CHS the phone.  Shortly thereafter, on June 27, 2018, Pitts sent a text message to the UCE thanking the UCE.  Pitts also asked the UCE, "…what did the brothers say about the photo?"  The UCE responded, "I haven't talked to the bro yet.  He has to get to a safe place before he looks at it."

On June 27, 2018, Pitts reached out to the UCE because he wanted to take him/her around downtown Cleveland to point out worthy targets for a terrorist attack.  Later in the day on June 27, the UCE met with Pitts in Maple Heights, Ohio and drove him to downtown Cleveland to talk about the reconnaissance Pitts had done the previous day. The meeting between Pitts and

---

[3] FBI surveillance on this date observed Pitts walking north on East 9th Street in downtown Cleveland toward Lake Erie, while simultaneously using a phone to take photos and/or video.

the UCE lasted approximately two and half hours.  During this meeting, Pitts and the UCE

discussed the impending July 4th bombing:

> DP:     They getting' they preparations started and I'm gonna come back down here on my own.  Lemme see – bang – bang – bang – bang – I'm comin' back down on the third.

> UCE:   Okay.

> DP:     So before the fourth of July.

> UCE:   Okay.  Alright.  Alright.  Alright, so –

> DP:     And I'm gonna over – and I'm gonna do a check around a full full full walk around.  I'm gonna make that my whole day.  Now you tell the Brothers and them now I am gonna need a little finance for that day.

> UCE:   Alright.

> DP:     Cuz I'm gonna spend that whole day down here walking to where how to uh – the route goin' go, everything.

> UCE:   Alright, well.  Let me know what you think, what you think that's gonna take.

> DP:     Well why – why I said that then I can peek security.  It's always good for me to peek the security.

> UCE:   Right.

> DP:     Take a look at it and how things goin' go wit' things that walk up and down and video everything.  So this'll be the phone – that'll be the phone me and you transfer back and forth for the video.

> UCE:   Alright.

> DP:     Cuz – cuz we're not sendin' nothin' to nobody.  We're jus' takin' pictures, takin' video.  And then once we finish it, we take and delete it and then when after we figure that I don't need the phone no more, I'm gonna destroy the phone cuz I know how I'm gonna destroy it.

> UCE:   Okay.

Later in the same conversation, Pitts expressed a desire to pack a car filled with

explosives near the parade, as opposed to his original idea of remote control cars filled with

bombs, because a car packed with explosives would take less time and training and still

accomplish the same end. Pitts further told the UCE that he would come back to downtown

Cleveland on July 2nd or 3rd to conduct additional reconnaissance:

> DP:     That's why I said I'm going down there the 2nd and the 3rd by myself.
>
> UCE:   Alright.  Because we gotta have this lined up.
>
> DP:     That's why I'm not going down by the naval base this time.  I'm walking the parade route, where they going.
>
> UCE:   Alright.
>
> DP:     I might find another pick, but that point is guaranteed.  That's the one we want.
>
> UCE:   Alright.  But we do – we gotta prioritize a pick so we're working towards –
>
> DP:     Right there in front that construction spot.
>
> UCE:   Alright – construction spot.
>
> DP:     They got – they got gas machines over there.  They gotta use the torches.
>
> UCE:   Okay.  Alright.
>
> DP:     Oh man that's it.

At the end of the meeting, Pitts gave the UCE another phone, which Pitts also used to record

reconnaissance photos and videos, so that the UCE could in turn provide it to al Qaeda brothers

to be used for targeting.  Pitts and the UCE came upon the U.S. Coast Guard Cleveland Station,

Cleveland Harbor (East 9th Street, Cleveland, Ohio) and saw a white, work van that was believed

to be involved in an ongoing construction project at the Coast Guard Station.  Pitts told the UCE

that "the brothers" should use a white van and fill it with explosives and park it in the specific

spot he showed the UCE.  Pitts recorded via video this location.  Pitts also stated that he wanted

to be strictly a planner of attacks for the brothers and talked about going to Philadelphia,

Pennsylvania and doing reconnaissance for an attack there.

On June 28, 2018, one of the phones used by Pitts was searched pursuant to a duly authorized warrant. A forensic examination of this phone, revealed two bayah (pledge of allegiance) videos recorded by Pitts, wherein Pitts discussed destroying, killing and annihilating the disbelievers.

Also recovered on the phone used by Pitts were reconnaissance photographs of various locations in downtown Cleveland taken by him, including the United States Coast Guard Station, the Rock and Roll Hall of Fame, the Anthony J. Celebreeze Federal Building, and the Cleveland Harbor.  Additionally, located on the phone were four videos of locations in downtown Cleveland taken by him.  The videos capture Pitts walking down East 9th Street in Cleveland pointing out potential targets such as the Celebreeze Federal Building, Coast Guard Station, and St. John's Cathedral.  The videos were narrated by Pitts and include comments about the kuffar (disbelievers), avoiding detection, "the wicked Catholics, Jews all of them," and taking St. John's Cathedral "off the map."

On June 28, 2018, the UCE placed two calls to Pitts.  The UCE first informed Pitts "the brothers" wanted him to search for a vehicle, and provide images and pricing information for the operation.  Pitts accepted the task and stated, "I'm already on it."  Pitts reiterated his role in supporting "the brothers" by providing logistical assistance, surveillance, and target identification.

During a second call on June 28, 2018, the UCE and Pitts continued their discussion regarding the purchase of a vehicle for the purpose of placing a bomb in it.  Pitts stated that purchasing a vehicle from dealerships, tire shops, or auto repair businesses would be difficult due to the requirements of providing a driver's license and title registration.  Instead, Pitts first suggested that Pitts locate a vehicle at a "chop shop" to facilitate an illicit vehicle transition for

cash (thus eliminating any record of the sale and evading detection by law enforcement). Thereafter, the UCE recalled a previous conversation wherein the UCE and Pitts had discussed using a straw purchaser to reduce suspicion and improve the likelihood of operational success. Pitts acknowledged and stated he located a used Honda Accord sedan for a purchase price of $1400.00 USD.  Pitts subsequently stated he could likely locate a used van for approximately $3500-$4000 USD.  The Pitts and the UCE then discussed the purchase of a Sport Utility Vehicle (SUV), as opposed to a van, because these vehicles would arouse less suspicion from law enforcement.  At the end of the call, Pitts indicated he would search for several vehicles and provide images and pricing information to the UCE on June 29, 2018.

On June 29, 2018, a second phone used by Pitts was searched, pursuant to a duly executed search warrant.  An initial forensic review revealed an approximately seven and a half minute video that was filmed on June 27, 2018, of downtown Cleveland that captures the Cleveland Harbor, the Rock and Roll Hall of Fame and U.S. Coast Guard Station.  The video is narrated by Pitts.

On June 30, 2018, the UCE called Pitts and told Pitts that the attack Pitts planned in Cleveland for July 4th was a "go" and that the al Qaeda brothers were happy with Pitts' plan for Cleveland.  The UCE, speaking in previously established code words, confirmed with Pitts that there would indeed be a large explosion in front of the U.S. Coast Guard Station in Cleveland on July 4.  The UCE explicitly stated that the attack will be on behalf of al Qaeda and Pitts acknowledged.  Pitts expressed to the UCE that Pitts needed to meet in person with the UCE in order to obtain a new telephone for Pitts' travel to Philadelphia to continue his planning for al Qaeda.  Pitts stated he had a target in mind in Philadelphia, but would not discuss this over the

phone, but rather would discuss this in person.  Pitts also discussed possibly traveling to San Francisco to conduct additional targeting and reconnaissance on behalf of al Qaeda.

On July 1, 2018, at approximately 9:25 a.m.,  Pitts and the UCE met at a location in Garfield Heights, Ohio. The purpose of this meeting was for Pitts to explain to the UCE his plan for Philadelphia.  During this meeting Pitts showed the UCE a map of Philadelphia and pointed out multiple landmarks that were worthy targets for bombing.  Pitts told the UCE that he planned on traveling to Philadelphia for the purpose of conducting reconnaissance for a future attack in Philadelphia.  Pitts identified for the UCE those buildings he believed to be worthy of attack. Pitts also stated that a truck bomb packed with explosives, such as the one used in Oklahoma City would be the best way to cause maximum damage.  The UCE pointed out to Pitts that there would be people inside when the bombs were detonated and that there would be human carnage. Pitts replied, "I don't give a s--t."  Pitts also stated that the "goody spot" for a terrorist attack was the Federal Building in Philadelphia and that he wanted to "hit 'em in the gut."  Pitts was again reminded by the UCE that people would die and that body parts would be flying around.  Pitts responded, "I don't care," and that he had "no regrets," would still be able to "go to sleep," and "I don't give a f--k."  Pitts was repeatedly reminded that these targeted attacks in both Cleveland and Philadelphia that Pitts was assisting in facilitating were at the behest of al Qaeda.  Pitts acknowledged this.  Later in the meeting, Pitts noted that he had "sixty-one days to get things in order in Philly."  Pitts was also shown the remote control car by the UCE during this meeting. Pitts told the UCE that he liked the car.  The UCE asked Pitts if he thought the car would work in an attack.  Pitts responded, "hell yeah."  Pitts told the UCE that he believed the BB's should be replaced with pieces of cut up metal, because "if BB's hit you, you can still live, but if shrapnel hits you— it will tear you up."  Pitts suggested to the UCE that the remote control car be used as

a distraction and rolled underneath a police car or federal agent car and detonated, and that the larger bomb then be detonated.  Pitts also suggested to the UCE that these remote control cars packed with explosives be given to the children of military personnel to play with at the parade, so that the children would unwittingly detonate the bombs.  Pitts also suggested to the UCE that the children of military personnel be given the cars as "gifts," so that the children could take the cars home and unwittingly blow up their own houses.  The meeting ended with the arrest of Pitts.

## II.     PSR OBJECTIONS

The government has one outstanding objection to the Presentence Report ("PSR").  The government objected to Probation's failure to apply the Official Victim Enhancement to Count 1.[4] (Presentence Report Final Disclosure, par. 36, PageID 205)   As of the date of the filing of this memorandum, there are outstanding objections.  Probation's stated reasons for not applying the official victim enhancement is that Pitts never spoke of a specific individual or individuals as the target of the offense.  (Id.)  This assertion by Probation is factually incorrect.  Pitts' goal was to kill military personnel.  For instance, on June 15, 2018, in a surreptitiously recorded conversation, Pitts stated the following:

> DP:     You wanna hit places, hit some of these army bases.
> UCE:   Yeah.
> DP:     Okay I ain't-I ain't mad at you when you hit them.
> UCE:   Yeah, yeah.
> DP:     Hit them, kill them.
> UCE:   Yeah, yeah.

Pitts further stated:

> DP:     The ones I would kill off and stuff like that would be the Marines. 'Cause that's all they-they already know what they gonna do. The Marines.
> UCE:   Yeah right. The Marines, they're blood thirsty. That's what they want.
> DP:     So there would be no hesitation on that part. None whatsoever.

---

[4] The defendant also had multiple objections to the PSR.

UCE:   No hesitation with taking off the head of a Marine? Taking off a jarhead?
DP:    No it wouldn't. It wouldn't. 'Cause just like if I may walk up to a person, can you-can you explain to me where this uh place is on the map and they be like yeah, it's a wrap.

As Pitts' plan for death and destruction evolved, he finally settled on inflicting carnage at a July 4 parade in Cleveland. This carnage was to be inflicted in the form of a van packed with explosives in front of the USCG station, as well as explosives secreted in remote control cars carrying American flags.  On July 1, 2018, Pitts was shown a remote control car by the UCE that was purportedly packed with explosives.  Pitts told the UCE that he liked the car.  The UCE asked Pitts if he thought the car would work in an attack.  Pitts responded, "hell yeah."  Pitts told the UCE that he believed the BB's should be replaced with pieces of cut up metal, because "if BB's hit you, you can still live, but if shrapnel hits you— it will tear you up."  Pitts suggested to the UCE that the remote control car be used as a distraction and rolled underneath a police car or federal agent car and detonated, and that the larger bomb then be detonated.  Pitts also suggested to the UCE that these remote control cars packed with explosives be given to the children of military personnel to play with at the parade, so that the children would unwittingly detonate the bombs.  Pitts also suggested to the UCE that the children of military personnel be given the cars as "gifts," so that the children could take the cars home and unwittingly blow up their own houses.

Clearly, these cited instances demonstrate that Pitts' crimes were motivated by a hatred for U.S. Military personnel, particularly those who had served overseas in the Middle East, such that would warrant the imposition of the "official victim" enhancement.  To state that Pitts targeted only government buildings is factually inaccurate.

Law in this circuit also supports the imposition of the "official victim" enhancement to Count 1 of the Indictment.  In U.S. v. Manns, 690 Fed. Appx. 347, the Sixth Circuit Court of

Appeals upheld the application of the three level "official victim" enhancement where Manns, an inmate at an Ohio penitentiary sent supposed anthrax powder to the Summit County Prosecutor's Office using the name of an individual in prison that Manns was seeking revenge against. Manns argued that his crime was not motivated by the victims' status as government officials, but rather was motivated by his desire to seek revenge against another prison inmate.  The Sixth Circuit rejected Manns argument noting that Manns "specifically sent the letters to government offices that had a history with Penn, using Penn's name, to create problems for Penn.  This is sufficient to show that Manns was 'motivated by' the government status of the recipients." Manns at 351-52.  Manns also argued that the sentencing enhancement was improperly applied because the letters were sent to government offices, not specified individuals as required by the Guidelines.  Manns claimed that because the letters were addressed to the Summit County Prosecutor's Office and the Clerk of Courts' Office, not specified individuals, the enhancement did not apply.  The Court also rejected this argument.  People employed by both the Summit County Prosecutor and Clerk of Courts opened these letters.  In Manns the Court held, that "a threat does not need to be directed at a named individual to meet the requirements of the official victim enhancement."  Manns at 353 citing United States v. Mattison, 946 F,2d 896, 1991 WL 213760, at *3 (6th Cir. 1991).  The Sixth Circuit then went on to cite similar holdings in other circuits.

Applied to the facts in this case, while Pitts did not target victims by name, he did target as the victims of his crime, *individual military personnel* that he desired to kill. While probation is accurate that physical U.S. owned buildings were surveilled to effect this goal, the underlying goal was to kill U.S. Military *people*.

U.S. v. Hudspeth, 208 F.3d 537 (6th Cir. 2000) also supports the application of the "official victim" enhancement in this case.  Hudspeth sent a threatening communication to the prosecuting attorney for Hamilton County, Ohio, Joe Deters.  In Hudspeth, the Court held that although Deters suffered little to no injury from the receipt of the threats, the application of § 3A1.2(a) depends on the victim's status, not whether he or she suffered harm.  Applied to the facts of Pitts' case, Hudspeth stands for the proposition that while Pitts was not successful in actually completing the terroristic acts that he was planning,§ 3A1.2(a) still applies.  Insofar as Pitts was charged with an attempt crime, he nonetheless is subject to the application of this guideline provision.

In conclusion, given the facts and legal authority cited herein, the government objects to probation not applying the three level "official victim" enhancement in § 3A1.2(a) as contemplated by the parties.

## III.   ADVISORY SENTENCING GUIDELINE CALCULATIONS

There is a difference between the guideline calculation contemplated by the parties and the guideline calculation calculated by the Probation Department.  The following represents the guideline calculation of the parties:

| Attempt to Provide Material Support or Resources to a Foreign Terrorist Organization | | |
|---|---|---|
| | | |
| Base offense level | 26 | § 2M5.3(a) |
| Intent, knowledge or reason to believe that support would be used to commit a violent act | 2 | § 2M5.3(b)(1)(E) |
| Terrorism Enhancement | 12 | § 3A1.4(a)<sup>5</sup> |
| Official Victim Enhancement | 3 | § 3A1.2(a) |
| **Subtotal** | **43** | |

---

[5] Because the terrorism enhancement is applicable to this case, Defendant's criminal history category is VI, pursuant to USSG § 3A1.4(b).

| Threats against the President of the United States | | |
|---|---|---|
| Base offense level | 12 | § _2A6.1(a)(1) |
| **Subtotal** | **12** | |

| Threats against Immediate Family Members of the President of the United States | | |
|---|---|---|
| Base offense level | 12 | § _2A6.1(a)(2) |
| **Subtotal** | **12** | |

| Multiple Count Adjustment Guideline § 3D1.4 | |
|---|---|
| Highest Group Offense Level | 43 |

The Probation Department's calculations are slightly different.  As to Count 1, the offense of Attempt to Provide Material Support to an FTO, Probation's calculated adjusted offense level was 40.  As to Count 2, the offense of Threats Against the President of the United States, Probation's calculated adjusted offense level was 18.  And finally, as to Count 3, the offense of Threats Against Immediate Family Members of the President of the United States, Probation's adjusted offense level was 18.

The difference in guideline calculation is not significant insofar as the parties have entered into an agreement for a binding sentence. The government requests that the Court impose the agreed upon sentence of 168 months and a lifetime of supervised release.  Whether the Court utilizes the guideline calculation of the parties or of probation, the agreed upon sentence of the parties inures to the benefit of the defendant, insofar as it is below the statutory maximum sentence of imprisonment applicable to Count 1 which is 20 years of imprisonment.

## IV.      SENTENCING RECOMMENDATION AND ANALYSIS OF THE SECTION 3553(a) FACTORS

The government recommends that the Court impose the binding term of imprisonment contemplated by the parties.  This is a sentence of imprisonment below the sentence called for by the advisory sentencing guidelines, and is the appropriate sentence after consideration of all of

the factors under 18 U.S.C. §3553(a). The Court should impose a 168 month sentence for Count 1, a 60 month sentence for Count 2, and a 60 month sentence for Count 3, and run the sentences concurrently.

### a) A 168 month or 14 year sentence is appropriate after consideration of the relevant Section 3553(a) factors.

After calculating the advisory guidelines range, the Court must consider the factors listed at 18 U.S.C. § 3553(a). Title 18, United States Code, Section 3553(a) states, in pertinent part:

(a) Factors to be Considered in Imposing a Sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established [by the Sentencing Guidelines];

(5) any pertinent policy statement [from the Sentencing Commission];

(6) the need to avoid unwarranted sentencing disparities among defendants with similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Although the Court must consider all of these factors, in this case, the most pertinent are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the public, and the sentencing range established by the sentencing guidelines.

### 1.)  The Nature and Circumstances of the Offense

Certain aspects of this case deserve special consideration by the Court when imposing sentence.

First, it is important to consider that at the heart of this case is Pitts' desire to assist al Qaeda, a foreign terrorist organization in inflicting harm on the United States.  Pitts' hatred for the United States and its military ran so deep that he was willing to kill for it.  While Pitts' primary target was the military, civilian casualties were also acceptable to him.

Second, Pitts' plan to detonate a bomb was devised by him in an effort to not only be symbolic, but also to maximize the potential for human carnage.  It was not inconsequential that Pitts chose the July 4 holiday as the day for a terrorist attack. That this holiday is arguably the most significant as a nation was not lost on Pitts.  Launching an attack on this day would have not only the intended symbolic effect, but also guaranteed that more people would be out and about, thereby maximizing deaths.  Choosing to detonate this bomb in downtown Cleveland where holiday festivities would be taking place and crowds were gathered, increased exponentially the potential number of human casualties.

Third, Pitts was earnest in his desire to provide support to al Qaeda.  While early in his evolution, Pitts' support of terrorist activities was limited to statements made online, this changed.  By mid-2018, Pitts was taking active steps to facilitate what he believed was an impending attack.  Pitts engaged in several planning meetings with someone he believed to be an al Qaeda operative; he conducted active reconnaissance of would-be targets, photographing

and videoing the same; and he provided his reconnaissance footage of would-be targets to individuals that he believed to be al Qaeda operatives.  Pitts also showed initiative in identifying a second target for attack, Philadelphia, a city he admittedly was more familiar with. When given an opportunity to extract himself from the terrorist plot, he failed to do so, instead telling the individual whom he believed to be an al Qaeda operative to "keep building (the bomb)."  In short, Pitts never expressed hesitation in the fact that he wanted this July 4 attack to happen.  When conversation became very graphic about the bloodshed and carnage that would occur, he stated "I don't give a f--k."  He wanted this to happen.  Moreover, he even expressed a desire to stand in the sidelines while it did and observe his handiwork.

Fourth, Pitts, even in the face of arrest, did nothing to stop what he believed was an impending terrorist attack.  When Pitts was interviewed he denied knowing the UCE well and offered little information.  During this interview Pitts was repeatedly asked if he knew of anything regarding July 4.  Pitts indicated he knew nothing about anything happening on July 4. Pitts failed to mention anything about his planning or others' planning for a July 4 attack.

## 2.)  The History and Characteristics of the Defendant

Pitts is 50 years old, with a criminal history dating back to 1987.  While some of his criminal convictions are non-violent, many are not.  The violent offenses include convictions for Robbery in 1989, Domestic Violence in 1990, and Robbery in 1993.  Pitts has no stable employment history.  He is not married.  Pitts was evaluated for competency after his arrest and found to be competent, however, diagnosed with two mental health conditions as set forth in

the competency evalution.[6]  While Pitts has some reported mental health history, it is not substantially documented in records received during this investigation.

Pitts was interviewed as part of the pre-sentence process.  His statements regarding acceptance of responsibility border on non-acceptance.  Pitts has no genuine remorse for his crimes, rather sees himself as a victim, regretting that he ". . .got tied up in this and would not have gotten involved."  Pitts also claimed to Probation that he had no intention to carry out the acts expressed to the UCE.  These post-hoc statements by Pitts are absolutely not supported by Pitts' statements and actions in connection with this investigation.  This lack of remorse is perhaps the greatest reason that Pitts is a danger to the community and must be incapacitated for a significant number of years.

### 3.)  The Need to Protect the Public

Demetrius Pitts is a dangerous person.  The atrocity that he not only condoned, but helped plan is mind boggling.  The consequences of Pitts connecting with the wrong people (i.e. real terrorists) instead of the federal government is frightening.  No doubt, left unchecked, Pitts would have continued to seek out and would have eventually found the people he was looking for—real terrorists.  More disturbing perhaps is that both immediately after arrest, and even more than a year after his arrest, Pitts still has no remorse.  There is no greater danger to the community than an individual with no remorse, no insight into the wrongness of this thinking, and an attitude of victimization.  Pitts is a legitimate candidate for an extended prison term and a lifetime of supervised release.  Continued monitoring of Pitts even after release from incarceration, provides some framework for continued protection of the public.

---

[6] Because this memorandum is a public filing, the government will not identify those ailments. Rather, the government refers the Court to the competency report.

### 4.)  The Applicable Sentencing Guidelines Range

The Court must consider—indeed, must start with—the advisory sentencing range determined by the application of the United States Sentencing Guidelines.  18 U.S.C.  § 3553(a)(4); <u>Gall v. United States</u>, 552 U.S. 38, 49-50 (2007).  Taking the calculation of either the parties or Probation, the advisory sentencing guideline range is 360 months to life imprisonment.   Here, the parties have considered the facts unique to this case, the history and characteristics of the defendant, and the need to protect the public in fashioning what they believe is an appropriate sentence for the conduct at issue.

## V.    CONCLUSION

Based on consideration of the advisory sentencing guidelines range and the Section 3553(a) factors identified above, the appropriate sentence for this defendant is 168 months of imprisonment, and a lifetime period of supervised release.  The government asks the Court to impose this sentence agreed upon by the parties.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ Michelle M. Baeppler
Michelle M. Baeppler (OH: 0065378)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 44308
(330) 761-0519
(330) 375-5492 (facsimile)
Michelle.Baeppler@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of February, 2020 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Michelle M. Baeppler
Michelle M. Baeppler
Assistant U.S. Attorney